IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FRANKLIN KLEIN,

                                                OPINION AND ORDER
                        Plaintiff,
                                                      19-cv-887-bbc
              v.

PAULINE HULSTEIN, AMANDA KRAGNESS,
TAMMY MAASEN AND WADE PULHAM,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se plaintiff Franklin Klein, who is incarcerated at New Lisbon Correctional Institution, is proceeding on claims that staff at the Jackson Correctional Institution failed to provide him the low bunk restriction that was prescribed for his vertigo and seizures, in violation of his rights under the Eighth Amendment and state negligence law.  Before the court is defendants' motion for summary judgment.  Dkt. #36.  Because plaintiff has not shown that any of the defendants acted with deliberate indifference to his medical conditions, I will grant defendants' motion for summary judgment with respect to his Eighth Amendment claims against them.  I decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims and will dismiss those claims without prejudice.

From the parties' proposed findings of fact and the evidence of record, I find the following facts to be undisputed unless otherwise noted.

UNDISPUTED FACTS

A. <u>The Parties</u>

During the time period relevant to this lawsuit, plaintiff Franklin Klein was incarcerated at the Jackson Correctional Institution, where defendants all worked. Amanda Kragness was a unit manager, Wade Pulham was a correctional sergeant, Tammy Maassen was the health services manager and a registered nurse, and Pauline Hulstein was a nurse clinician 2.

Defendant Kragness is responsible for supervising security staff assigned to the Melrose Unit, including defendant Pulham. As the health services manager, defendant Maassen supervises nursing staff and provides administrative support and direction for the health services unit. She generally does not provide direct medical care to inmates. Maassen is typically sent copies of incident reports regarding medical incidents. Sometimes the copy is just for informational purposes; other times, the copy allows her to follow-up on a specific issue.

B. <u>Relevant Prison Policies and Procedures</u>

1. <u>Requests for medical care</u>

When an inmate has a medical concern, or wishes to communicate with medical staff or requests to be seen by health services staff, he must fill out a health service request form and submit it to the health services unit. If an inmate wants to be seen, he must check the box labeled "Health Services" and write in the description section the medical issue he wants

assessed.  Otherwise, if an inmate is just requesting information, he is to check the box entitled "Information."  Health service requests are collected from the housing units daily and triaged by nursing staff within 24 hours of receipt, if possible.

Nursing staff will schedule an appointment for the inmate as necessary, based on the symptoms reported.  For non-urgent matters, the inmate is scheduled for an appointment as soon as possible, depending on staff availability, the relative urgency of the medical problem and the number of other patients requiring urgent medical care.  Inmates describing urgent matters are scheduled for an appointment the same day with a nurse, who may schedule a same-day appointment with an advanced care provider if necessary.  Inmates are instructed to alert unit security staff if they believe they have a medical or life-threatening emergency.  Security staff then call or notify the health services unit.  Health services unit managers such as defendant Maassen usually do not see health service requests unless nursing staff forward them to her to address a particular issue.

2.  Medical restrictions

The Wisconsin Integrated Corrections System (WICS) is a database that contains a profile on each inmate in the Wisconsin Department of Corrections, including information about the inmate's criminal sentence, disciplinary history, housing location, classification and special medical needs and restrictions.  Certain medical restrictions are placed into WICS so that security staff can obtain the information quickly without having to consult health service staff.

Decisions about whether an inmate needs a low bunk or a low tier for medical reasons are made by nursing staff, health care providers or the Special Needs Committee and noted in WICS. If an inmate asks security staff for a low bunk or low tier, security staff will direct the inmate to fill out a health service request form so the inmate can be seen by a medical professional for the purpose of determining whether a low bunk or low tier accommodation is necessary.

The Department of Corrections has enacted a health service policy and procedure (no. 300:07) entitled "Medical/Dental Restrictions/Special Needs," along with "Appendix 1: Guidelines for Restrictions/Special Needs," which provide the following criteria for the issuance of a first-floor or low tier restriction:  severe debilitating illness; significant functional limitations secondary to arthritis, muscular skeletal disorders or neurological disorders; significant symptomatic cardiovascular disease; significant symptomatic chronic lung disease; post operative restrictions; active seizure diagnosis (not remote history that requires no treatment); and blindness. The guidelines are not mandatory and are subject to the medical conclusions of the Special Needs Committee, with input from the advanced care provider, if needed. The committee makes the decision to approve or deny an inmate request for a special accommodation or comfort item based on a review of the inmate's recent medical history and taking into consideration any security concerns.

Medical restrictions for a low bunk and a low tier are not automatically ordered together. A diagnosis of seizure disorder or vertigo does not necessarily mean that an inmate receives both a low bunk and a low tier restriction. According to defendant Maassen, if an

4

inmate is seizure-free for a determined amount of time, he does not generally need a low bunk or low tier restriction.  If recent seizures are noted, then the inmate would be granted a low bunk restriction, but not necessarily a low tier restriction.  In addition, not every complaint of vertigo or vomiting requires a low tier restriction.  There are other avenues to try prior to moving rooms, such as medication, rest and activity restrictions.

3.  Cell assignments

Unit managers and sergeants are responsible for assigning a bunk whenever an inmate is transferred to a new unit.  These security staff members first check the inmate's Special Handling Summary in WICS for any medical restrictions or consultation with health services unit staff, if necessary, prior to assigning a bunk.  The security staff may call the health services unit to verify whether an inmate has a low bunk or low tier restriction in place.  However, security staff do not independently determine whether these accommodations are necessary – those decisions are made by the health services unit.  (Plaintiff attempts to dispute this fact by stating that security staff have the authority to move any inmate to a lower tier at any time, even without a medical restriction.  However, plaintiff has not cited any admissible evidence to support his assertion.)  Security staff such as defendants Kragness and Pulham do not have access to inmate medical files or medical conditions that necessitate the restriction or accommodation.

C. Plaintiff's Cell Assignments and Medical Treatment

On March 21, 2018, while plaintiff was incarcerated at a different institution, Dr. Scott Hoftiezer ordered plaintiff a low bunk and low tier restriction for 60 days. Dr. Hoftiezer completed a physical examination report for plaintiff on April 25, 2018. The report listed "vertigo response to meclizine" as plaintiff's current active medical problem and noted that plaintiff had "epilepsy grand mal seizures as a child which did resolve after some years[;] however as an adult[,] he experienced head trauma and began experiencing grand mal seizures again and was placed back on his Dilantin. When he takes his Dilantin he's generally very well controlled." Dr. Hoftiezer ordered plaintiff a low bunk restriction for one year. (Although plaintiff says that Dr. Hoftiezer told him at the April 25 appointment that the restriction was for both a low bunk and low tier for one year, his medical record does not contain such a restriction. Dkt. #39-1 at 5, 20.)

When plaintiff arrived at Jackson on June 12, 2018, he was housed in Unit X, Tier A in a low bunk in cell A95. Unit X is the intake unit, where new inmates are temporarily housed following a transfer until they complete the intake process and are assigned to a regular housing unit. Tier A is a lower tier on the first floor.

As part of intake on June 12, 2018, defendant Hulstein reviewed plaintiff's medical chart, including Dr. Hoftiezer's April 25 report and order. Hulstein completed a transfer screening form to identify plaintiff's medical needs.

On August 20, 2018, plaintiff had a dizzy spell while working in the main kitchen and was seen by the health services unit. Maassen received an incident report for

6

informational purposes on August 21, 2018.  On September 3, 2018, while he was walking back to his housing unit, plaintiff became nauseous.  The on-call nurse was called.  Plaintiff was told to take his medication for nausea.  Maassen received an incident report for informational purposes on September 4, 2018.

On September 11, 2018, plaintiff was moved to the Melrose Unit, Tier A2.  He was assigned to a low bunk in cell 250.  Tier A2 is an upper tier on the second floor, which meant that plaintiff would have had to walk up a flight of stairs to get to his cell.  At that time, he had a medical restriction only for a low bunk and not for a low tier.  On September 25, 2018, plaintiff was moved to Tier B2 (also an upper tier) on the Melrose Unit) and was assigned to a low bunk in cell 206.

On January 5, 2019, health services was called when plaintiff was at recreation lifting weights.  He told the officer that he had vertigo and had vomited in the toilet.  Defendant Kragness was not at the institution that day.  Defendant Hulstein saw plaintiff the same day.  She was not aware that plaintiff was housed in an upper tier, and plaintiff did not ask to be moved to a lower tier during this appointment.  Hulstein told plaintiff to avoid strenuous activity and added a "no strenuous activity" restriction to WICS.  The next day, Hulstein saw plaintiff for a follow-up on his vertigo.  Plaintiff reported no new episodes and said he was taking his Meclizine for dizziness.  Defendants Maassen and Kragness received a copy of the incident report regarding the vertigo on January 7, 2019.

On January 9, 2019, plaintiff submitted two health service requests, complaining of ongoing issues.  In one request, he stated that he was experiencing dizziness and had spoken

to the unit manager about getting him a low bunk on a low tier.  Defendant Hulstein responded to both of plaintiff's health service requests on January 10, 2019, telling plaintiff that she would schedule him to be seen by the advanced care provider.  She further advised him that he could put in a special needs request for a low bunk and low tier.  Hulstein believed that this was an appropriate course of action because plaintiff was not complaining of new problems (which might have prompted her to schedule him for a same-day nursing appointment) and his complaints were related to ongoing, non-urgent medical issues for which she had just seen him.

As a nurse, Hulstein could provide only over-the-counter pain relievers, ice and activity restrictions.  She could not prescribe plaintiff medications.  At that time, plaintiff was taking meloxicam for pain and had an activity restriction.  Hulstein had the authority to order a temporary low tier restriction for severe symptoms or conditions, but she determined that plaintiff did not need one because his symptoms were not severe, he was already taking meclizine for dizziness and he would be scheduled for an appointment with an advanced care provider to determine whether any additional treatment was necessary.

Kragness was not notified by the health services unit or a security supervisor that plaintiff needed to be moved to a lower tier.  (The parties dispute whether plaintiff ever discussed a low tier restriction with defendants Kragness and Pulham, and whether these defendants knew about any of plaintiff's medical conditions.  Kragness says that she does not recall any conversations about a low tier restriction and did not become aware of plaintiff's medical issues until the instant lawsuit.  Plaintiff says that on January 9, 2019, he

8

told Kragness and Pulham about his vertigo and seizure disorder, the dizziness he had while walking up and down stairs, his fear about falling down the stairs and his wish to be moved to a lower tier. Plaintiff also says that Kragness learned about his vertigo in an incident report on January 7, 2019.)

Seizure disorders are considered a chronic condition that require an annual provider visit for assessment and medication management. The advanced care provider is responsible for making the determination regarding what each individual patient needs for care related to seizures. Plaintiff's advanced care provider appointment would have been scheduled by a medical assistant as soon as the advanced care provider could see him, which is dependent upon the provider's availability and any emergent issues of other patients that need to be addressed first. (Plaintiff says no such appointment took place.)

Plaintiff did not submit a request to the Special Needs Committee for a low tier restriction. (Plaintiff says that he thought he had a low tier restriction when he arrived at Jackson and was never told how to make a request of the Special Needs Committee.) In any event, according to Maassen, plaintiff would not have met the Special Needs policy criteria for a permanent low tier restriction for his seizure activity at the time he arrived at Jackson. Although he was experiencing dizziness, plaintiff's records show that he had not had any seizure activity for some time and his seizures were considered to be under control.

On January 20, 2019, plaintiff fell down the stairs. He was treated for his fall at Gundersen Hospital. His records from that visit state that the "symptoms he was mentioning [were] of an abnormal variation and there were concerns for malingering

9

intent…" and that he "was stable for discharge with concerns that his symptoms were malingering in nature." Dkt. 39-1 at 29-30. Subsequent treatment records reveal that plaintiff's "right lower extremity has loss of sensation to light touch and pinprick," dkt. #51-21 at 4, but note that he had "normal and full strength in bilateral lower extremities with hip flexion, knee flexion, and extension, dorsiflexion, plantarflexion, and EHL testing," dkt. #51-20 at 3.

Dr. Liu reviewed the video of plaintiff's fall. She documented his grabbing a handle and slowly releasing himself into a sitting position, after which he "gradually rolled down the steps onto the floor. His head appeared to be well controlled as he rolled down the steps. No seizure activity seen." On January 22, 2019, defendant Maassen received copies of the incident reports completed by staff.

After plaintiff's release from the hospital on January 24, 2019, Dr. Liu ordered plaintiff a restriction for a low bunk and low tier. That day, plaintiff was moved to Tier B1 (a lower tier) on the Melrose Unit. He remained on this lower tier (other than for a brief move to Tier A1, another lower tier) until he transferred to New Lisbon Correctional Institution on February 19, 2019.

Plaintiff did not write to defendant Maassen about a low tier restriction and she did not respond to any of his health service requests for a low tier restriction. Maassen only became aware of plaintiff's request for a low tier when he filed an offender complaint in February 2019. She met with the institution complaint examiner around March 2019 to discuss plaintiff's complaint that he fell down the stairs on January 20, 2019 because he

believed he was supposed to be housed on a lower tier.  Maassen reviewed plaintiff's records and confirmed that his low tier restriction had expired on April 30, 2018, prior to his arrival at Jackson.  He only had a low bunk restriction in place at the time he arrived at Jackson on June 12, 2018, and he was assigned to a low bunk.

OPINION

A.  Eighth Amendment

A prison official may violate the Eighth Amendment if the official is "deliberately indifferent" to a "serious medical need."  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). See also Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)) (Eighth Amendment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain,'" including "grossly inadequate medical care.").  Defendants accept for the purpose of summary judgment that plaintiff had serious medical needs.  Dkt. # at 11.  Therefore, the question is whether plaintiff has submitted enough evidence to allow a reasonable jury to conclude that any of the defendants acted with "deliberate indifference" toward his serious medical need.  Gomez v. Randle, 680 F.3d 859, 865 (7th Cir. 2012).

"Deliberate indifference" means that the officials were aware that the prisoner faced a substantial risk of serious harm but disregarded the risk by consciously failing to take reasonable measures to address it.  Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997).  To be considered "deliberately indifferent," an official "must both be aware of the facts from

11

which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Snipes v. Detella, 95 F.3d 586, 590 (7th Cir. 1996). Inadvertent error, negligence, gross negligence and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996).

Medical providers such as defendants Hulstein and Maassen in this case may violate an inmate's Eighth Amendment rights if they prescribe a course of treatment without exercising medical judgment or if they do so knowing that the treatment will be ineffective. Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662-63 (7th Cir. 2016).  In cases like this one, in which a prisoner alleges that he received some treatment (in this case, a medical restriction) for his medical condition, but that the treatment was inadequate, the relevant question is whether defendants' actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996).  In such cases, courts must defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. Pyles, 771 F.3d at 409. A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Id.

Evidence sufficient to create a jury question might include the obviousness of the risk

from a particular course of medical treatment, the defendants' persistence in "a course of treatment known to be ineffective" or proof that the defendants' treatment decision departed so radically from "accepted professional judgment, practice, or standards" that a jury may reasonably infer that the decision was not based on professional judgment.  Id.

In addition, plaintiff must show how each of the defendants was personally involved in depriving or delaying plaintiff necessary treatment.  Kuhn v. Goodlow, 678 F.3d 552, 555-56 (7th Cir. 2012).  An individual cannot be held liable in a § 1983 action unless he or she caused or participated in an alleged unconstitutional deprivation of rights.  Pepper v. Village of Oak Park, 430 F.3d 805, 810 (7th Cir. 2005).

1.  Defendants Kragness and Pulham

Plaintiff claims that defendants Kragness (supervisor of security staff assigned to the Melrose unit) and correctional sergeant Pulham were deliberately indifferent to his medical conditions by failing to insure that his lower tier restriction was enforced by assigning him to a cell on the lower tier.  However, the undisputed facts show that plaintiff did not have a lower tier restriction in place once he transferred to Jackson, or later, when  he fell on January 20, 2019.  Although plaintiff says that Dr. Hofteizer verbally told him on April 25, 2018 that he had a low tier restriction for one year, neither the medical record from that appointment nor Dr. Hofteizer's order mention a low tier restriction and none was recorded in WCIS.  Thus, Kragness and Pulham did not disregard any existing medical restriction for plaintiff.

13

Although plaintiff contends that he told Kragness and Pulham about his seizure disorder and his need for a cell on a low tier, it is undisputed that decisions about medical restrictions are made by nursing staff, advanced health care providers and the Special Needs Committee.  Plaintiff contends that security staff could have assigned him to a low tier at their own discretion, but he fails to present any evidence to support his assertion.  In any event, even if Kragness and Pulham knew about plaintiff's medical conditions and could have moved him to a lower tier at their own discretion, a reasonable jury could not conclude that they had any responsibility to do so in this case.  Department policy sets forth specific criteria for issuing low tier restrictions, and even an inmate diagnosed with a seizure disorder is not automatically entitled to a low tier.  The medical providers who saw plaintiff at Jackson before January 25, 2019 determined that a low tier restriction was not warranted, and Kragness and Pulham were entitled to rely on their judgment.  Therefore, I conclude that defendants Kragness and Pulham are entitled to summary judgment on plaintiff's Eighth Amendment claims against them.

2.  Defendants Maassen and Hulstein

Plaintiff contends that defendants Maassen (Health Services Manager) and Hulstein (a nurse clinician) were deliberately indifferent to his medical conditions by refusing to implement or issue a low tier restriction for him.  (Plaintiff also contends that medical staff failed to follow several Department of Adult Institutions policies, including #500.30.55 and #500.30.58, regarding chronic illnesses and communication of health needs, but plaintiff

14

was not allowed to proceed on any such claim.  Further, even if defendants violated department or prison policies, these violations do not state a federal constitutional claim over which this court may exercise jurisdiction.  Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003).  Violations of prison policies also do not give rise to state law claims over which this court may exercise supplemental jurisdiction.  Holm v. Dittman, No. 16-cv-781-bbc, 2017 WL 455444, at *2 (W.D. Wis. Feb. 2, 2017).)

As previously discussed, there is no evidence that plaintiff had a low tier restriction in place during the time period relevant to this case.  Therefore, defendants Maassen and Hulstein cannot be held liable for failing to implement any such restriction.  Plaintiff argues that as medical professionals, defendants Maassen and Hulstein should have known that a person who experiences seizures and vertigo has difficulty with balance and is at a greater risk for falling on stairs.  According to plaintiff, these defendants would have known that he had to travel up and down a flight of stairs to his cell numerous times a day.  However, under the circumstances of this case, no reasonable jury could conclude that Maassen and Hulstein acted with deliberate indifference by failing to take action to issue plaintiff a low tier restriction.

a.  Hulstein

Defendant Hulstein performed an initial intake for plaintiff upon his arrival at Jackson in June 2018 and reviewed Dr. Hoftiezer's April 2018 report that stated that

plaintiff's seizures are "very well controlled" when he takes his Dilantin.  At that point, plaintiff had only a low bunk restriction issued by Dr. Hoftiezer for one year.

Hulstein did not see plaintiff again until January 5, 2019, when plaintiff reported experiencing vertigo and vomiting while lifting weights.  She issued a "no strenuous activity" restriction and followed up with plaintiff the next day.  On January 6, plaintiff reported that he had not had any other episodes and was taking his Meclizine as scheduled.  Contrary to plaintiff's assertion, a reasonable jury could not conclude that Hulstien had any reason to believe a low tier restriction was necessary for plaintiff at this point.  Plaintiff did not request that he be moved to a lower tier during this appointment, and Hulstein knew that his seizure disorder was well-controlled by Dilantin and that he was taking Meclizine for vertigo. Although plaintiff previously had reported feeling dizzy on August 20, 2018 and nauseous on September 3, 2018, he was seen by other providers for both incidents and did not require any follow-up.  The incidents were isolated and would not have alerted Hulstein that plaintiff's symptoms or condition required greater intervention several months later on January 5, 2019.

After plaintiff submitted health service requests on January 9, 2019 about ongoing dizziness and a low tier restriction, Hulstein referred plaintiff to an advanced care provider to determine whether additional treatment was required.  Although plaintiff says that he was never scheduled to see an advanced care provider, it is undisputed that a medical assistant and not Hulstein would have been responsible for scheduling that appointment.  Pursuant to prison policy, Hulstein also encouraged plaintiff to submit a request to the Special Needs

Committee for a low tier, but plaintiff did not do so.  Although plaintiff says that he did not know how to submit such a request, there is no evidence that he asked for information or assistance but was refused help.

Hulstein believed that the referrals were the appropriate course of action for plaintiff because his complaints were related to ongoing, non-urgent medical issues for which she had just seen him.  She determined that plaintiff did not need a temporary low tier restriction because his symptoms were not severe, he was already taking Meclizine and he would be seeing an advanced care provider.  Plaintiff has failed to present any evidence apart from his own lay opinion to contradict her medical judgment.  No reasonable jury could conclude, on the basis of these undisputed facts, that Hulstein's actions were "so significant a departure from accepted professional standards or practices that it calls into question whether [they] actually [were] exercising [their] professional judgment."  Pyles, 771 F.3d at 409.  Even if another medical provider would have provided plaintiff a temporary low tier restriction in early January 2019, a difference of opinion is not sufficient by itself to show deliberate indifference.  Id.  Accordingly, defendant Hulstein is entitled to summary judgment with respect to plaintiff's Eighth Amendment claim against her.


  b.  Maassen

Unlike defendant Hulstein, defendant Maassen was not involved in any decision making regarding plaintiff's need for a medical restriction.  She did not provide any direct patient care to plaintiff, respond to his health service requests or receive a request from him

for a low tier restriction.  The undisputed facts show that Maassen's involvement in this case was limited to her being informed about plaintiff's medical incidents after they occurred. Maassen received incident reports about plaintiff's dizzy spell in the kitchen on August 20, 2018, feeling nauseous on September 3, 2018 and having vertigo and vomiting while lifting weights on January 5, 2019.  However, as discussed, other medical providers determined that plaintiff's symptoms were not severe and his condition was under control; plaintiff was provided with medical care following each incident; and no follow-up was required on Maassen's part.  After plaintiff fell and sustained injuries on the stairs on January 20, 2019, he was treated at a local hospital and issued a low tier restriction for the remainder of his stay at Jackson Correctional Institution.  Therefore, no jury could reasonably conclude that Maassen's failure to issue a low tier restriction prior to the January 20 incident rose to the level of deliberate indifference.  Accordingly, defendant Maassen is entitled to summary judgment as to plaintiff's Eighth Amendment claim against her.


## B. Medical Negligence

Plaintiff also asserts state law negligence claims against defendants regarding their failure to provide or implement a low tier restriction for his medical conditions.  As defendants point out, plaintiff cannot bring a negligence claim under Wisconsin law against a state official without first timely submitting a written "notice of claim" in person or by certified mail on Wisconsin's attorney general within 120 days of the event giving rise to the action.  Wis. Stat. § 893.82(3).  The parties seem to dispute whether plaintiff has complied

18

with this requirement.  Plaintiff says that he served a notice of claim on the attorney general by certified mail on June 18, 2019 and has submitted a copy of the certified mail receipt. Dkt. #51-24.  However, defendants say that they never received a notice of claim from plaintiff.  In any event, it is unnecessary to resolve any dispute regarding the notice of claim because I am dismissing plaintiff's state law claims on another ground.

The general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial.  28 U.S.C. § 1367(c)(3); Burritt v. Ditlefsen, 807 F.3d 239, 252 (7th Cir. 2015).  In this instance, I will decline to exercise supplemental jurisdiction over plaintiff's state law claims because I am granting summary judgment to defendants on all of the federal claims.  Plaintiff may refile these claims in state court, subject to the applicable state law requirements regarding the notice of claim and statute of limitations.

                                   ORDER

IT IS ORDERED that:

1.  The motion for summary judgment filed by defendants Pauline Hulstein, Amanda Kragness, Tammy S. Maassen and Wade Pulham, dkt. #36, is GRANTED as to plaintiff's federal claims.

2.  Plaintiff's state-law negligence claims are DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

3.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 24th day of May, 2021.

> BY THE COURT:
>
> /s/
>
> _____
> BARBARA B. CRABB
> District Judge